**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

BRYANT HAWKES,

                 Defendant.

Criminal Action No. 22-111-GBW

---

David C. Weiss, Alexander Ibrahim, U.S. ATTORNEY'S OFFICE, Wilmington, Delaware.

      *Counsel for Plaintiff*

Eleni Kousoulis, Janet Bateman, PUBLIC FEDERAL DEFENDER'S OFFICE, Wilmington, Delaware.

      *Counsel for Defendant*

**MEMORANDUM OPINION**

December 4, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Presently before this Court is Defendant Bryant Hawkes' ("Hawkes" or "Defendant")
Motion to Dismiss the Indictment, D.I. 25, charging Hawkes with Possession of a Firearm by a
Felon, in violation of 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)"). Defendant contends that
§ 922(g)(1) is unconstitutional both on its face and as applies to him under recent Supreme Court
and Third Circuit authority. The Government opposes Defendant's Motion. D.I. 28. For the
reasons set forth below, Defendant's Motion is denied in all respects.

## I.   BACKGROUND

The Government alleges that officers saw Hawkes engage in drug deals on August 24,
2022. D.I. 28 at 2. When officers began following him, Hawkes entered a convenience store,
removed a loaded gun from his shirt, and placed it on the shelf of the store. *Id.* at 2-3. Hawkes
was stopped outside the store and arrested. *Id.* At the time of his arrest, Hawkes was found in
possession of 19 baggies of heroin and one baggie of marijuana. *Id.* at 2.

This is not Hawkes' first interaction with the criminal justice system. D.I. 28 at 3-4.
Defendant's prior convictions include (i) a 2012 Delaware felony conviction for possession with
intent to distribute heroin, for which he was sentenced to 157 days in prison; (ii) a 2014 federal
felony conviction in the District of Delaware for possession of a firearm as a felon, for which he
spent 52 months in prison; and (iii) a 2018 federal felony conviction in the District of Delaware
for possession of a firearm as a felon, for which he spent 57 months in prison. *Id.* At the time of
his arrest, Hawkes was under supervised probation for the 2018 conviction. *Id.* at 19.

Defendant files the present Motion to Dismiss challenging the constitutionality of § 922(g)(1) on grounds that the statute is unconstitutional both on its face and as applied to Hawkes following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*") and the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ("*Range*"). D.I. 25.

## II.    LEGAL STANDARD

The Second Amendment of the United States Constitution holds that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). As the Supreme Court recognized in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The *Heller* Court recognized, for instance, the longstanding prohibitions on the possession of firearms by felons. *Id.* at 570; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' ... *We repeat those assurances here*.") (emphasis added) (citation omitted).

Recently, the Supreme Court revisited its Second Amendment jurisprudence in *Bruen*. 142 S. Ct. 2111. The Court in *Bruen* considered a constitutional challenge to a New York State licensing scheme that criminalized the possession of "'any firearm' without a license, whether inside or outside the home." *Id.* at 2123 (citation omitted).

3

In ruling on the constitutionality of the statute, the Supreme Court recognized that, following its prior holdings in *Heller* and *McDonald*, the Courts of Appeals adopted a two-step framework for analyzing Second Amendment challenges. *Id.* at 2125-26. Under the first step of this analysis, the so-called historical evidence step, the government was required to prove that its firearms regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. If the regulated conduct fell beyond the Second Amendment's historical and original scope, the activity was not protected, and the analysis ended there. *Id.* at 2126. If, however, "historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two," which analyzes "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.*

The Supreme Court in *Bruen* rejected this two-step analysis, finding that it was "one step too many." *Id.* at 2127. According to the Court, "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* Thus, the Court found that, when it is determined that the Second Amendment's plain language protects an individual and his conduct, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127, 2131. While recognizing that this historical approach can be difficult in circumstances that raise "unprecedented societal concerns or dramatic technological changes," the Court explained that courts could conduct their analysis using analogical reasoning and "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation . . . ." *Id.* at 2132. According to the Court,

4

"analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. *Id.* (emphasis in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Shortly after *Bruen*, the Third Circuit in *Range* considered the constitutionality of § 922(g)(1) as it applied to Appellant Brian Range, who had been convicted of making a false statement to obtain food stamps in violation of Pennsylvania law in 1995. 69 F.4th at 101. Range sought a declaration from the United States District Court for the Eastern District of Pennsylvania that § 922(g)(1) violates the Second Amendment as applied to him. *Id.* at 99.

Applying the Supreme Court's *Bruen* decision, the Third Circuit agreed that § 922(g)(1) was unconstitutional as it applied to Range. *Id.* at 106. In reaching this decision, the Third Circuit interpreted *Bruen's* historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Id.* at 101 (quoting *Bruen*, 142 S. Ct. at 2127).

Under the first step of the *Bruen* framework, the Third Circuit found that Range was one of "the people" protected by the Second Amendment and that his request "to possess a rifle to hunt and a shotgun to defend himself at home," was protected Second Amendment conduct. *Id.* at 100. The Third Circuit then examined whether the Government met its burden to demonstrate that stripping firearms from one convicted of Range's prior felony is consistent with the Nation's historical tradition of firearm regulation and concluded that it did not. *Id.* at 103. According to

5

the Third Circuit, the Government failed to show that "our Republic has a longstanding history and tradition of depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added). Thus, the Court held that § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. *Id.* The Third Circuit noted, however, that its decision was a "narrow one" that found only that § 922(g)(1) was unconstitutional as to Range. *Id.* at 106. Judge Ambro's concurrence emphasized this point and added that *Range* "does not spell doom for § 922(g)(1)[] [which] remains 'presumptively lawful.'" *Id.* at 110 (Ambro, J., concurring).

## III.   DISCUSSION

Defendant argues that, following *Bruen* and *Range*, § 922(g)(1) is unconstitutional both on its face and as it applies to him. D.I. 25 at 1. Because Defendant lacks standing to challenge the constitutionality of § 922(g)(1) under the Second Amendment, his Motion fails. Further, even if standing was proper, the Government has carried its burden of showing that § 922(g)(1) is constitutional as it applies to Defendant, and Defendant has not proven that the statute is facially invalid. Thus, Defendant's Motion to Dismiss is DENIED.

### A.   *Defendant lacks standing to challenge the constitutionality of § 922(g)(1).*

Defendant contends that "the indictment in this case must [] be dismissed unless the government can carry its burden of showing a sufficient historical tradition of permanently disarming people like Mr. Hawkes." D.I. 25 at 19. Yet to raise this argument, Defendant must have standing to challenge the constitutionality of § 922(g)(1) under the Second Amendment. In other words, Defendant must satisfy the threshold requirements of Article III. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). To exercise Article III standing, Defendant must prove that

he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendant has the burden of establishing each element. *Id.*

"The second element, causation, demands a causal connection between the injury and the conduct complained of." *Siegel v. U.S. Dept. of Treas.*, 304 F. Supp. 3d 45, 50 (D.D.C. 2018) (emphasis added). The third element, redressability, requires that it is likely "that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

As Defendant was already subject to the terms of probation at the time of his gun possession, he cannot meet the causation element of Article III standing. *United States v. Cooper*, 1:23-cr-00004, Dkt. No. 37 (D. Del.). "Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotation marks omitted); *United States v. Rahimi*, 61 F.4th 443, 464 (5th Cir. Mar. 2, 2023) (Ho, J., concurring) ("Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons."). In fact, "[p]robationers' liberties are restricted in areas from search-and-seizure protections to associational rights to bodily autonomy." *United States v. Krauss*, No. CR 23-34 (JEB), 2023 WL 7407302, at *4 (D.D.C. Nov. 9, 2023). Defendant, under the terms of his supervised release, forfeited his right to possess a firearm. As such, any limitations on his Second Amendment rights resulted from his status as a parolee, not § 922(g)(1).

Similarly, due to his probationary status, Defendant cannot show that his injury is redressable. The injury that Defendant alleges was suffered—deprivation of his right to possess a

7

firearm—would not be cured by a favorable decision from this Court, as Defendant was deprived of his Second Amendment protections under the terms of his probation. *Cf.* D.I. 25 at 3 (noting that Defendant "faces years in federal prison for doing exactly what the Second Amendment grants him the right to do: possess a firearm"). Therefore, to redress his alleged injury and restore his right to possess firearms, Defendant would have to challenge the constitutionality of his underlying probation. He has not, so the redressability element of Section III standing is not met.

Because Defendant cannot show that his injuries were caused by § 922(g)(1) and cannot prove redressability, the Court finds that he lacks standing to challenge the constitutionality of the statute under the Second Amendment.

### B. *Alternatively, the Government has met its burden to prove that § 922(g)(1) is constitutional as applied to Defendant.*

In determining whether § 922(g)(1) is constitutional as it applies to Defendant, *Bruen* and *Range* instruct the Court to "first decide whether the text of the Second Amendment applies to a person *and his proposed conduct*." *Range*, 69 F.4th at 101. If the Defendant can show that he is a "person" protected under the Second Amendment and that his conduct is protected conduct, the burden shifts to the government to "prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* (citing *Bruen*, 142 S. Ct. at 2127).

Defendant argues that, like the party in *Range*, he is a "person" protected under the Second Amendment "[d]espite his criminal history." D.I. 25 at 9. The Government and this Court agree.[1]

---

[1] *Range* holds that a "the people," as used throughout the Constitution, "unambiguously refers to all members of the political community, not an unspecified subset." *Range*, 69 F.4th at 101. Thus, Defendant is a "person" for purposes of the Second Amendment.

D.I. 28 at 17. Yet, *Bruen* also requires Defendant to show that he is engaged in conduct that the Second Amendment protects. *See Range*, 69 F.4th at 101. In support of his Motion, Defendant contends that his "alleged conduct" is "possessing a firearm." D.I. 25 at 11. However, the Supreme Court has long explained that "the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128. Rather, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. In *Bruen*, the Court held that "individual self-defense is 'the central component' of the Second Amendment right," thus possessing a firearm for self-defense was a protected activity. *Bruen*, 142 S. Ct. at 2118 (citing *McDonald*, 561 U.S. at 767). Similarly, in *Range*, the Third Circuit found that the question of whether Range was engaged in "protected" conduct was easily answered where he sought "a rifle to hunt and a shotgun to defend himself at home." *Range*, 69 F.4th at 103. These statements indicate that the Court must consider Defendant's conduct beyond his claim that the Second Amendment merely applies to his possession of a firearm.

Here, the Government alleges that Defendant possessed a firearm while engaging in drug deals. D.I. 28 at 2-3. According to the Government, Defendant entered a public store and hid a loaded gun among loaves of bread while shoppers were present. *Id.* While § 922(g) regulates "possession" of a firearm by a felon, not dangerous use of it, Defendant's actions are not those of someone with a lawful Second Amendment purpose. The Court lacks the full factual record necessary to say whether Defendant's actions were protected Second Amendment conduct. However, Defendant's decision to leave a gun in a public store, at the least, speaks to his dangerousness to society, a relevant factor under *Range* that the Court considers below.

Assuming that Defendant was engaged in protected Second Amendment conduct, the Court still finds that § 922(g)(1) is constitutional as it applies to Defendant. Defendant, relying on the Third Circuit's holding in *Range*, argues that restricting his right to bear arms is inconsistent with historical firearm restrictions, which were "'not about felons in particular or even criminals in general'" but were rather "'about threatened violence and the risk of public injury.'" D.I. 25 at 19 (quoting *Kanter v Barr*, 919 F.3d 437, 456 (7th Cir. 2019) (Barrett, J. dissenting)). According to Defendant, despite "historical support for disarming someone with a demonstrably violent criminal history," he, like Range, "has not been convicted of any violent offenses."[2] *Id.* at 19-20. Yet, this matter is highly distinguishable from *Range*. Range, unlike Defendant, was convicted of a misdemeanor of making a false statement to obtain food stamps. *Range*, 69 F.4th at 98. Further, unlike Defendant, Range successfully completed his probationary sentence "without incident" and committed no other crimes for over 28 years. *Id.* The Third Circuit clarified that its decision in *Range* was "a narrow one" in which the court found no history or tradition supported "depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added).

---

[2] In making this argument, Defendant mischaracterizes the history of firearm regulation and Defendant's chief cited cases. The linchpin of the analysis is not whether a past crime was violent, but whether the defendant's possession of guns is dangerous or perpetrates public disorder. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence *or whose possession of guns would otherwise threaten public safety.*") (emphasis added). Defendant also quotes a Judge Bibas dissent stating that "[t]he historical touchstone is danger, not virtue." D.I. 25 at 19 (quoting *Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting), *abrogated by Range*, 69 F.4th 96). Defendant neglected to mention the portion of that opinion which explicitly analyzes that historical record and finds that "[d]isarming burglars and drug dealers makes sense because their past crimes were inherently dangerous." *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting).

Defendant, on the other hand, has a far more extensive and serious criminal history. He has three prior adult felony convictions since 2012, when he was 16 years old. D.I. 28 at 23. Defendant has also violated probation four times, including by possessing a firearm at the time of his arrest for the charges currently pending before this Court. *Id.* Defendant has spent nine of the past 11 years incarcerated.[3] *Id.* And, as the Government highlights, Defendant's disqualifying felony convictions concerned the dealing of heroin, a drug known to cause overdose and death. *Id.*

Also of note, whereas Range sold his firearms immediately after learning that he was barred from possessing them,[4] Defendant has been arrested by law enforcement three times for unlawful possession of a firearm. D.I. 28 at 2-3. In this particular instance, Defendant's gun was loaded and was abandoned in a public area while Defendant allegedly attempted to flee from police. *Id.* Defendant's actions represent an escalating pattern of probation violations, drug offenses, and flouting of gun regulations that make him clearly distinguishable from Range. *Cf. Range*, 69 F.4th at 101, 106 (noting Range's minor violations and indicating that the opinion was narrow). Defendant asks the Court to hold that even those with a past history of drug trafficking, probation violations, and habitual flouting of gun laws have an inviolate right to bear arms. Defendant's ask goes far beyond *Range* or *Bruen*. The Court is not willing to go that far.

The Court agrees with the Government that the disarming of individuals who pose a danger to society is deeply rooted in our country's legal traditions. *See* D.I. 28 at 12. To determine whether § 922(g)(1) is in line with this historic tradition, *Bruen* mandates that the Court determine

---

[3] Thus, while his initial conviction may not have been as recent as the one this Court analyzed in *U.S. v. Cooper*, 1:23-cr-00004 (D. Del.), Defendant is unlike Range, who had a long post-release history of not offending. *Cf. Range*, 69 F.4th at 98.

[4] *Range*, 69 F.4th at 99-100.

whether the historical regulation and the modern-day regulation are "relevantly similar under the Second Amendment." *Bruen*, 142 S. Ct. at 2132. Under *Bruen,* two metrics are relevant to this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Applying this standard, the Court finds that the Government has raised proper historical analogues to § 922(g)(1) to survive dismissal.

First, like the historical traditions identified by the Government, the "why" behind § 922(g)(1)'s firearm prohibition to individuals with a history of drug trafficking is clear: the goal is to protect the public from disruptive and dangerous conduct. While '[i]llegal drug trafficking is a largely modern crime' with no direct historical analogue," *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *6 (M.D. Pa. Sept. 11, 2023), the Government identifies historical traditions that deprived Second Amendment rights from those who were dangerous and posed a threat to public safety, regardless of whether their crimes were inherently violent.[5] D.I. 28 at 12-14. For instance, the Government cites restrictions ranging from the 17th century which sought to disarm those who threatened public safety and disturbed the orderly function of society. *Id.* at 12 (citing a "17th century statute empowered the government to 'seize all arms in the custody

[5] These historical analogues distinguish this case from *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) and *Unites States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023). In those cases, the Government failed to meet its burden of demonstrating that prohibiting drug traffickers from possessing firearms is consistent with the Nation's historical tradition of firearm regulation. Here, by contrast, the historical record presented by the Government demonstrates that the Government has carried its burden. Accordingly, the Court, as others have before it, does not find these opinions persuasive. See *United States v. Hedgepeth*, No. CR 22-377-KSM, 2023 WL 7167138 (E.D. Pa. Oct. 31, 2023); *Reichenbach*, 2023 WL 5916467, at *10 n.93; *United States v. Pearson*, No. CR 22-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) ("We are mindful of two recent decisions (now on appeal) finding section 922(g)(1) unconstitutional as applied to persons with earlier convictions for possessing narcotics with intent to distribute. We are not persuaded by the reasoning in those decisions given the presumptively lawful regulatory measures enacted by Congress in section 922(g)(1).").

or possession of any person' who was 'judge[d] dangerous to the Peace of the Kingdom'"), *id.* at 14 (highlighting 19th century laws requiring "'those threatening to do harm' to 'post bond before carrying weapons in public'"), *id.* (citing an 1866 order restricting "disorderly [], vagrant, or disturber[s] of the peace" from bearing arms).

While Defendant's qualifying crimes were not themselves violent, they were dangerous as there can be no doubt that the dealing of drugs poses a societal threat. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting) ("Disarming burglars and drug dealers makes sense because their past crimes were inherently dangerous."), *abrogated by Range*, 69 F.4th 96. Furthermore, guns and drugs "are a dangerous combination" that exacerbate the risk of violence when used together. *See United States v. Jones*, 900 F.3d 440, 449 (7th Cir. 2018) ("[G]iven the dangers of drug trafficking, guns and drugs often go hand in hand."); *United States v. Clinton*, 825 F.3d 809, 812 (7th Cir. 2016) (noting that where "a firearm is found in close proximity to the drugs or its paraphernalia, the conclusion that the firearm is connected to that drug activity is a reasonable one in light of the common use for that purpose."). Disarming a person who violates state and federal drug laws "fits well within the historical disarmament of those who pose a threat to public safety." *Id.* at 24; *See also Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."); *see also United States v. Yancey*, 621 F.3d 681, 686-687 (7th Cir. 2010) (citing *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009)) (recognizing the "connection between drug use and violent crime" and explaining that "there is no constitutional problem with separating guns and drugs."). This is especially true where, as here, there is a pattern of escalating violations.

As to "how" § 922(g)(1) burdens Second Amendment rights, § 922(g)(1) prohibits individuals, like Defendant, who have been convicted of felony drug trafficking offenses from possessing firearms. The same is true with the Government's referenced analogues, which restricted individuals deemed to be dangerous and disruptive to society from possessing a firearm. D.I. 28 at 22-23 ("'Legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1).'") (citing *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. June 2, 2023)). Thus, the Government has identified historical analogues that are relevantly similar to § 922(g)(1), and the Court finds that § 922(g)(1), as applied to an individual like Defendant who has been convicted of recent felony drug trafficking offenses, "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

### C. *Defendant has not shown that § 922(g)(1) is unconstitutional on its face.*

Finally, Defendant's facial challenge to the validity of § 922(g)(1) is unfounded. To succeed on a facial challenge, Defendant "must establish that no set of circumstances exists under which the [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). Yet, as even Defendant concedes, there is historical support for disarming someone with a demonstrably violent criminal history. D.I. 25 at 19-20. Further, in both *Heller* and *McDonald*, the Supreme Court recognized the "longstanding prohibitions on the possession of firearms by felons," which the Court noted was "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786. As neither *Bruen* nor *Range* invalidate, alter, or overturn the legal

14

principles and analysis set forth in *Heller* and *McDonald*,[6] these holdings stand.  Thus, Defendant cannot prove that § 922(g)(1) is unconstitutional in all of its applications, and his facial challenge to § 922(g)(1) fails.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED.  The Court will issue an Order consistent with this Memorandum Opinion.

---

[6] *See e.g.*, *Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2132-2133 ("*Heller* and *McDonald* point toward at least two metrics [to assess whether a historical regulation is a proper analogue for a modern firearm regulation]: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").